Filed 3/18/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VENDOR SURVEILLANCE CORPORATION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> PATRICK W. HENNING, JR., as Director, etc., et al., <br><br> Defendants and Respondents. | D076079 <br><br><br><br> (Super. Ct. No. 37-2016-00037096-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed. Request for judicial notice granted in part and denied in part.

Ogletree, Deakins, Nash, Smoak & Stewart, Jack S. Sholkoff and Tracie Childs for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Lisa W. Chao, Assistant Attorney General, Brian D. Wesley, Tim Nader and Anna Barsegyan, Deputy Attorneys General, for Defendants and Respondents.


Vendor Surveillance Corporation (VSC) appeals from an adverse judgment in its action seeking refund of $278,692 in unemployment insurance taxes assessed by the California Employment Development

Department (EDD).  The outcome turns on whether project specialists hired by VSC between January 1, 2011 and December 31, 2013 (the audit years) are classified as employees or independent contractors.  The first-impression legal issue is whether in making that determination, the court should apply (1) the ABC test announced in *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 956–957 (*Dynamex*) and later codified in the Labor Code; or instead (2) the *Borello* factors (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*)), codified in an EDD regulation, California Code of Regulations, title 22, section 4304-1 (hereafter regulation 4304-1).

With little case law for guidance and an eye on appeal, the trial court prudently analyzed the evidence alternatively under each standard and determined that project specialists are VSC's employees.  We hold that *Borello* provides the applicable standard in assessing unemployment insurance taxes during the audit years.  Because the court's findings under that standard are supported by substantial evidence and its qualitative weighing of the *Borello* factors was an appropriate exercise of the court's discretion, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Source Inspection*

Aerospace manufacturers use component parts made by others (suppliers) that must be fabricated to exacting specifications.  Disaster can ensue if a defective part escapes detection and is installed in an aircraft.  To help ensure that such tragedies do not occur, the manufacturer inspects the part at the supplier's facility.  The industry calls this source inspection.

B. *Verify, VSC, and VTR*

Verify, Inc. (Verify) provides management services, including source inspection, to aerospace and defense manufacturers. VSC is a wholly owned subsidiary of Verify. VSC maintains a database of persons qualified to perform source inspection, called project specialists. It also recruits and screens individuals to add to that database. During the audit years, the database contained more than 300 California-based project specialists.

When a Verify customer requests a source inspection, Verify negotiates the services to be performed and the corresponding fee. If the customer requires part-time, project-based on demand source inspection, Verify subcontracts with VSC to provide a qualified project specialist. After identifying qualified project specialists from the database, VSC contacts each to determine their interest in the work. A project specialist is free to decline work and there are no negative repercussions for doing so. VSC submits resumes of interested project specialists to Verify, which forwards them to its customer to choose from.

VTR, Inc. is a "staffing subsidiary" of Verify. If Verify's customer needs full time work (including but not limited to source inspection) in one location exceeding three months, Verify subcontracts with VTR to provide qualified personnel.

VSC classifies its source inspectors as independent contractors; VTR classifies its personnel as employees.

C. *The Contractual Relationship Between VSC and Project Specialists*

VSC engages project specialists under an "Independent Contractor Agreement" (Agreement). The Agreement characterizes their relationship as that of independent contractor, stating:

3

> "[I]t is mutually understood and agreed that Contractor is at all times acting and performing his/her duties and functions in the capacity of an independent contractor; that it is Contractor who enters into this Agreement; and that no provision in this Agreement shall imply or create an employer-employee relationship . . . . Further, it is mutually understood and agreed that VSC shall neither have the right to exercise, nor shall VSC exercise, direction or control over the detail, manner, means or method which Contractor or his agents and employees use in performing his/her duties under this Agreement . . . ."

VSC presents the Agreement on a take-it-or-leave-it basis. The only negotiable term is the project specialist's hourly rate. A project specialist is free to accept work from VSC's competitors; however, the Agreement prohibits soliciting employment from Verify's "customer or a supplier." VSC may terminate the Agreement "for cause" and also without cause on 30 days' notice.

For each project, VSC and the project specialist also agree to an addendum containing details of the assignment and the project specialist's hourly rate. The addendum requires the project specialist to invoice time and expense charges, "using the prescribed forms," which as a practical matter is Verify's computer system. The addendum also requires the project specialist to provide VSC and the customer with an inspection report and "detailed narrative" using "prescribed forms."

D. *The Legal Landscape*—Empire Star Mines, Borello *and* Dynamex

Some legal background is helpful in placing the remaining litigation history in context. California has an unemployment insurance program providing benefits for " 'persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum.' " (*Air Couriers International v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 931–932 (*Air Couriers*).) Tax contributions from

4

employers fund this program. (*Id.* at p. 932.) However, a hirer is required to pay the tax only for its employees, not for independent contractors. (*Ibid.*)

In *Empire Star Mines Co., Ltd. v. California Employment Commission* (1946) 28 Cal.2d 33 (*Empire Star Mines*) the California Supreme Court held that in distinguishing an employee from an independent contractor for purposes of unemployment insurance tax, "the most important factor is the right to control the manner and means of accomplishing the result desired." (*Id.* at p. 43.) "Other factors to consider" are:

> "(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Empire Star Mines,* at pp. 43–44.)

In *Borello*, the California Supreme Court applied the *Empire Star Mines* factors in the context of worker's compensation. As a result, they are now commonly known as *Borello* factors. (*Borello*, *supra*, 48 Cal.3d at pp. 350–351.) And for many years, California courts "applied the test articulated in *Borello, supra,* 48 Cal.3d 341 to determine whether a worker is an employee or an independent contractor." (*Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131*,* 1151, review granted Jan. 15, 2020, No. S259027 (*Gonzales*).) Then in 2018, *Dynamex* addressed application of the *Borello* test in the context of a wage-and-hour lawsuit in which delivery drivers alleged they had been misclassified as independent contractors. On

5

the wage order claims, the court declined to apply *Borello* in favor of a "simpler" three-part "ABC" test.[1] (*Dynamex*, *supra*, 4 Cal.5th at p. 950, fn. 20.) "Under the ABC standard, the worker is an employee unless the hiring entity establishes *each* of three designated factors: (a) that the worker is free from control and direction over performance of the work, both under the contract and in fact; (b) that the work provided is outside the usual course of the business for which the work is performed; *and* (c) that the worker is customarily engaged in an independently established trade, occupation or business." (*Ibid.*)

E. *EDD Determined that VSC Misclassified Project Specialists*

Having classified project specialists as independent contractors, VSC did not pay unemployment insurance tax on their earnings. After a project specialist sought unemployment insurance benefits, EDD conducted an audit of VSC. In the audit, EDD found that with one exception, project specialists did not operate an established business of their own. They did not have their own clients, advertise, or hold themselves out as self-employed. EDD also found that project specialists had a "continuous" relationship with VSC. "They would get assignments and then get new assignments when the assignments were completed." The audit further determined that source inspection "was an integral part" of VSC's business. EDD concluded that "[w]ithout these workers, there is no business." Based on these and related

---

[1] The Industrial Welfare Commission (IWC) promulgates wage orders "fixing for each industry minimum wages, maximum hours of work, and conditions of labor" "Consequently, wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026.)

findings, EDD determined that VSC's project specialists are "[c]ommon [l]aw [e]mployees" under Unemployment Insurance Code section 621, former subdivision (b) (hereafter, section 621(b))[2] and regulation 4304-1.

In April 2014, EDD assessed VSC $1,046,578.35 for unemployment insurance, state disability insurance, and personal income tax, plus approximately $48,000 in interest. After VSC's administrative challenges, EDD reduced the assessment to $278,692.45. VSC paid the tax and filed this action for refund.

F. *Superior Court Litigation*

Although *Dynamex* dealt with wage orders and did not exist during the audit years, at trial in 2019 EDD asserted that *Dynamex* applied retroactively to unemployment insurance assessments. VSC maintained that *Borello* applied.

Ten representative project specialists testified. On several *Borello* factors, the evidence was largely undisputed. For example, VSC paid all the project specialists hourly. The witnesses also agreed that source inspection requires highly skilled individuals. Many of the project specialists had a longstanding relationship with VSC—some had been working for VSC between 20 and nearly 30 years. All the project specialists believed they were independent contractors.

On other factors, however, the testimony varied and in some respects conflicted. For example, one project specialist operated under a corporate entity with its own business license. However, several others worked for VSC in their individual capacities. Some who created a corporate entity for VSC work had no other employees and no client besides VSC.

_____

[2] Undesignated statutory references are to the Unemployment Insurance Code.

There was also a range of evidence regarding the extent of VSC's supervision and control. In addition to VSC's right to terminate without cause, there was evidence that a project specialist encountering a problem or concern on the job "could initially go to their Verify project leader who could coordinate help, bringing the expertise that's required." VSC measures a project specialist's performance by the number of defective parts escaping detection. It will compel a project specialist who allows an excessive number of "escapes" to redo the work without pay.

G. *Statement of Decision*

In a detailed statement of decision, the court stated it was "manifestly unfair" to apply the ABC test, which was "unknown to all parties at the time of the [project specialist] contracts at issue, the audit, and the administrative proceedings." Nevertheless, noting that judicial decisions are generally applied retroactively, and that *Dynamex* is concerned with a hiring business evading its "fundamental responsibilities," the court "reluctantly" applied *Dynamex*. In doing so, the court found that VSC's only client is Verify, and source inspection is "at the core" of what "the Verify group of companies" provides. Accordingly, the court determined the project specialists are VSC's employees because VSC failed to establish "part B of the *Dynamex* test: that the worker performs work that is outside the usual course of the hiring entity's business."

Alternatively, recognizing that "a reviewing court might conclude . . . that the court should have used the *Empire Star*[/][*Borello*] criteria," the court reached the same result, finding:

1. VSC retained "control over the details of a critical part of the work" by (1) mandating the form project specialists use to report inspection results; and (2) having the right to terminate without cause on 30 days' notice. Also,

8

VSC employees "could be contacted in the event of questions or problems" and VSC provided ethics and safety training.

2. Project specialists were not engaged in a separately established occupation or business.

3. Neither VSC nor the project specialists provided the tools, instruments, and place of work.

4. Many project specialists had ongoing long-term relationships with VSC.

5. VSC paid project specialists hourly.

6. The Verify group of companies provides source inspection. The court rejected VSC's "strained effort to portray itself as just a database manager."

7. VSC is a business enterprise.

8. Source inspection requires highly skilled and experienced workers.

9. Under the Agreement, the parties believed they were creating an independent contractor relationship.

The court gave the greatest weight to findings that "the project specialists are absolutely critical to VSC's success" and " 'active instruments' " of VSC's enterprise.

## DISCUSSION

The single issue presented to the trial court for decision—and thus the single issue we review—is whether EDD properly characterized VSC's project specialists as employees for purposes of work they performed during the audit years 2011–2013. This requires that we answer two questions: (1) for purposes of assessing unemployment insurance tax, what is the appropriate test for determining whether a worker was an employee or independent contractor for work performed during that period; and (2) did the trial court correctly apply the appropriate test in reaching its decision? We ultimately

9

determine that, with one minor exception that does not affect the result, the trial court properly applied the *Borello* factors to conclude that the project specialists were employees. Addressing VSC's remaining arguments, we explain the trial court did not make and was not obligated to make the additional findings that VSC objects to.

A. Borello *Applies to Unemployment Insurance Taxes Assessed for Work Performed Before January 1, 2020.*

VSC contends that as a matter of law, *Borello* applies in determining liability for unemployment insurance tax for work performed during the audit years. VSC also asserts that its due process rights would be violated by applying *Dynamex* retroactively. As explained below, we agree with the first contention, making it unnecessary to consider the second.

1. *The Holding in* Dynamex *Applies Only to Alleged Violations of Wage Orders and Related Labor Code Claims.*

Whether certain workers should be classified as employees or independent contractors presents a question of law that we review de novo. (*Air Couriers*, *supra*, 150 Cal.App.4th at p. 932.) In *Dynamex*, this classification question arose in the context of alleged violations of a California wage order. (*Dynamex*, *supra*, 4 Cal.5th at pp. 913–914.) The wage order defined " ' "[e]mploy" ' " as including to " ' "suffer, or permit to work." ' " (*Dynamex*, at p. 926.) A wage order ensures that workers are paid enough to maintain at least a subsistence standard of living. The court concluded that these objectives supported "a very broad definition of the workers who fall within the reach of the wage orders." (*Id.* at p. 952.) In light of those policies, *Dynamex* "liberally construed" the "suffer or permit to work standard" to apply to all workers who "can reasonably be viewed as 'working in the hiring entity's business.' " (*Id.* at p. 953.) The Court found it to be "appropriate and most consistent with the history and purpose of the suffer or permit to work

10

standard in California's wage orders" to require the hiring entity to establish that the person is an independent contractor under the ABC test.  (*Id*. at pp. 956–957.)

At the same time, "*Dynamex* did not purport to replace the *Borello* standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections."  [Citation.]  To the contrary, the Supreme Court recognized that different standards could apply to different statutory claims." (*Garcia v. Border Transportation Group, LLC* (2018) 28 Cal.App.5th 558, 570 (*Garcia*).)  For example, in *Garcia*, this court held that although *Dynamex* applied to the plaintiff's wage order claims, *Borello* applied to non-wage-order claims involving overtime, wrongful termination, and waiting time penalties. (*Garcia*, at p. 571.)  Similarly, in *Gonzales*, the court held that "statutory claims alleging misclassification not directly premised on wage order protections and which do not fall within the generic category of 'wage and hour laws' are appropriately analyzed under . . . the '*Borello*' test."  (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1140.)

Unlike *Dynamex*, this case does not involve alleged violations of a wage order or related claims.  Rather, it concerns VSC's statutory obligation to pay unemployment insurance tax for work performed during the audit years. Also unlike *Dynamex*, the definition of employee for purposes of unemployment insurance tax is not whether the hirer suffered or permitted the person to work.  Rather, during the audit years, section 621, former subdivision (b) defined employee as "[a]ny individual who, under the *usual common law rules* applicable in determining the employer-employee relationship, has the status of an employee."  (Stats. 2010, ch. 522 (Sen. Bill

11

No. 1244), § 1, italics added.)[3] Thus, to determine if VSC's project specialists are employees for unemployment insurance tax purposes, we look not to the wage order definition—"suffer or permit to work"—that was central in *Dynamex*, but instead to a statute *Dynamex* had no occasion to address and the definition in section 621, former subdivision (b) that requires application of "the usual common law rules."

  2. *The "Usual Common Law Rules" Under Section 621, Former Subdivision (b) Are the* Borello *Factors and Not the* Dynamex *Test.*

Beginning in 1981 and continuing to present, regulation 4304-1 has defined "the usual common law rules" under section 621, former subdivision (b):

> "Whether an individual is an employee for purposes of Section[] 621[,] [former subdivision] (b) . . . will be determined by the usual common law rules applicable in determining an employer-employee relationship. Under those rules . . . the most important factor is the right of the principal to control the manner and means of accomplishing a desired result. If the principal has the right to control the manner and means of accomplishing the desired result, whether or not that right is exercised, an employer-employee relationship exists. Strong evidence of that right to control is the principal's right to discharge at will, without cause.

> "(a) If it cannot be determined whether the principal has the right to control the manner and means of accomplishing a desired result, the following factors will be taken into consideration:

---

[3]     Effective January 1, 2020, the Legislature amended section 621(b) to delete "the usual common law rules" and replace it with the ABC test. (Stats. 2019, ch. 296, § 5.) In this opinion unless otherwise indicated, references to section 621(b) are to section 621, *former* subdivision (b), as quoted in the text immediately above.

"(1) Whether or not the one performing the services is engaged in a separately established occupation or business.

"(2) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of a principal without supervision.

"(3) The skill required in performing the services and accomplishing the desired result.

"(4) Whether the principal or the person providing the services supplies the instrumentalities, tools, and the place of work for the person doing the work.

"(5) The length of time for which the services are performed to determine whether the performance is an isolated event or continuous in nature.

"(6) The method of payment, whether by the time, a piece rate, or by the job.

"(7) Whether or not the work is part of the regular business of the principal, or whether the work is not within the regular business of the principal.

"(8) Whether or not the parties believe they are creating the relationship of employer and employee.

"(9) The extent of actual control exercised by the principal over the manner and means of performing the services.

"(10) Whether the principal is or is not engaged in a business enterprise or whether the services being performed are for the benefit or convenience of the principal as an individual." (Cal. Code Regs. tit. 22, § 4304-1.)

In both purpose and effect, the regulation restates the *Borello* factors. It "lists the same factors to be considered in applying the right-to-control test that the *Borello* court listed." (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 351 (*Espejo*).) Therefore, in determining whether VSC's project specialists are employees or independent contractors, the threshold

inquiry is: *in what legal context is the classification being made?* If the context is the hirer's obligation to pay unemployment insurance taxes during the audit years, section 621, former subdivision (b) and regulation 4304-1 compel applying *Borello*. This conclusion is unaffected by *Dynamex*'s retroactive application because *Dynamex* simply does not apply to classification issues involving unemployment insurance taxes for work performed during the audit years. In concluding otherwise, the trial court erred.

Focusing on section 621, former subdivision (b)'s reference to the "common law"—a body of law derived from judicial decisions rather than from statutes or constitutions—EDD contends that the *Dynamex* ABC test should nonetheless apply notwithstanding regulation 4304-1 and the caselaw construing it. EDD notes the "inherent capacity for growth and change" in the common law (*Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd.* (2009) 175 Cal.App.4th 1074, 1090), and suggests that even if *Borello* was "the usual common law rule" under section 621, former subdivision (b) during the audit years, by the time of trial the common law had "evolve[d]" in *Dynamex.*

EDD's "evolution" argument disregards the effect of regulation 4304-1 in defining the statutory term, "usual common law rules." "Given the importance of certainty in tax law" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 23 (conc. opn. of Mosk, J.)), the regulation provides necessary guidance for taxpayers and is inconsistent with an intent to leave the classification of workers as employees or independent contractors under section 621, former subdivision (b) to case-by-case determinations and evolving judicial doctrine.

14

EDD's position also ignores the context in which *Dynamex* was decided. As the Supreme Court's very recent *Vazquez* decision makes clear, prior to *Dynamex* the Supreme Court had never spoken on the employee/independent contractor classification question in the specific context of wage order claims and related Labor Code violations. (*Vazquez v. Jan-Pro Franchising International, Inc.* (2021) 10 Cal.5th 944, 952 (*Vazquez*) ["*Dynamex* presented a question of first impression concerning how a wage order's suffer or permit to work standard should apply in the employee or independent contractor context."]; *id.* at p. 953 ["*Borello* was not a wage order case and that decision did not purport to determine who should be interpreted to be an employee for purposes of a wage order. We resolved this question for the first time in *Dynamex*."]; see also *Gonzales*, *supra*, 40 Cal.App.5th at p. 1157 ["*Dynamex* did not reach the question of whether the ABC test applies to nonwage order related Labor Code claims."].) It was for this reason that the *holding* in *Dynamex* applied retroactively. As to wage order and related Labor Code violations, *Dynamex* "did not change a settled rule on which . . . parties . . . had relied." (*Vazquez, supra,* 10 Cal.5th at p. 948.) But the same cannot be said of the classification question *in the context of unemployment insurance*, where the usual common law classification rules were clearly articulated by the Supreme Court in *Empire Star Mines*—rules that later became known as the *Borello* standard. (*Empire Star Mines*, *supra*, 28 Cal.2d at pp. 43–44.) Significantly, *Dynamex* did not purport to overrule *Empire Star Mines*. (*Vazquez, supra,* at p. 952 [noting that *Dynamex* "did not overrule any prior California Supreme Court decision"].) Consistent with both preexisting law as well as the Supreme Court's most recent exposition on the topic in *Vazquez*, *Dynamex* does not represent an evolution of the employee/independent contractor classification analysis in the context of

15

assessing unemployment insurance taxes under section 621, former subdivision (b).

    3. *Recent Legislation Confirms the* Borello *Factors Apply In Assessing Unemployment Insurance Taxes for Work Performed Prior to January 1, 2020.*

EDD further asserts that the enactment of Assembly Bill No. 5 (2019–2020 Reg. Sess.) (Assembly Bill 5) in 2019 "unequivocally" demonstrates that "*Dynamex* is the appropriate test" to evaluate project specialists' work in the audit years. To the contrary, however, this recent legislation reflects an express legislative understanding that for purposes of calculating unemployment insurance taxes, EDD would transition from applying the *Borello* factors to utilizing the *Dynamex* ABC test only for work performed on or after January 1, 2020.

After *Dynamex* was decided, the Legislature enacted Assembly Bill 5 (Stats. 2019, ch. 296), which amended both the Labor Code and Unemployment Insurance Code.[4] The stated legislative purpose in enacting Assembly Bill 5 was to "codify" the *Dynamex* decision and to "clarify" the decision's application in state law. (Stats. 2019, ch. 296, § 1(d).) To do so, among other things, it added former section 2750.3 to the Labor Code.[5]

---

[4]     VSC's unopposed request for judicial notice of Assembly Bill 5 is granted. (*St. John's Well Child & Family Center v. Schwarzenegger* (2010) 50 Cal.4th 960, 969, fn. 9 [taking judicial notice of a Senate Bill].)

[5]     Effective September 4, 2020, Labor Code section 2750.3 was repealed and was transferred without substantive changes to Labor Code sections 2775, subdivision (b)(1) and 2785. Because the later nonsubstantive recodification is not relevant for our purposes, we discuss the substantive changes in the context of former Labor Code section 2750.3 as they became effective on January 1, 2020. Necessarily, all references to Labor Code section 2750.3 are intended as references to former Labor Code section 2750.3.

16

Subdivision (a)(1) of this statute codified the *Dynamex* ABC test (1) "[f]or purposes of the provisions of this [Labor] code"; (2) "the Unemployment Insurance Code"; and (3) for "the wage orders of the Industrial Welfare Commission." (Stats. 2019, ch. 296, § 2.) Assembly Bill 5 also amended section 621, which as we have already discussed previously distinguished in former subdivision (b) between employees and independent contractors based on the "usual common law rules." The bill deletes "usual common law rules" in section 621, former subdivision (b) and, effective January 1, 2020, replaces it with the ABC test.[6] Thus, "while the *Dynamex* court repeatedly emphasized that the controversy before it—and implicitly its holding—was limited to the wage and hour context [citation], the Legislature made clear that it was broadly adopting the *Dynamex* holding for purposes of all benefits to which employees are entitled under the Unemployment Insurance Code,

---

[6] Effective January 1, 2020, section 621 now reads:

"Employee" means all of the following:" [¶] . . . [¶]

"(b) Any individual providing labor or services for remuneration has the status of an employee rather than an independent contractor unless the hiring entity demonstrates all of the following conditions:

"(1) The individual is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

"(2) The individual performs work that is outside the usual course of the hiring entity's business.

"(3) The individual is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." (Stats. 2019, ch 296, § 5.)

the Labor Code, and all applicable wage orders." (*People v. Uber Technologies* (2020) 56 Cal.App.5th 266, 277 (*Uber*).)

In expanding the *Dynamex* ABC test to unemployment insurance tax assessments, the Legislature also specifically addressed retroactivity. Former Labor Code section 2750.3, subdivision (i)(1) provides that the ABC test in subdivision (a) of the statute "does not constitute a change in, but is declaratory of, existing law," but only "*with regard to wage orders of the Industrial Welfare Commission and violations of the Labor Code relating to wage orders.*" (Italics added.) Conspicuous by its omission in this subdivision is any assertion that the ABC test was also declaratory of existing law with regard to unemployment insurance.[7] The inescapable inference is that the Legislature recognized that adopting the ABC test was in that context a change in existing law (i.e., a change in section 621, former subdivision (b) and regulation 4304-1), and as such, should not be applied retroactively with respect to unemployment insurance. If anything more were needed, subdivision (i)(3) of former Labor Code section 2750.3 states that except as provided in (i)(1) and (i)(2) (that is, except with respect to applying the ABC test to wage orders and Labor Code violations),[8] "the provisions of this section of the Labor Code shall apply to work performed on or after January 1, 2020." Nowhere in subdivisions (i)(1) or (i)(2) is there any mention of unemployment insurance taxes.

---

[7]    As we have already explained, any such contention would have been disingenuous in light of the Supreme Court's *Empire Mines* decision, which was the governing law when section 621, former subdivision (b) was adopted and which is the basis for regulation 4304-1.

[8]    Subdivision (i)(2) of former Labor Code section 2750.3, not relevant here, provides that insofar as the statute would "relieve an employer from liability," those subdivisions apply retroactively to existing claims.

These express legislative directives limiting retroactivity of Assembly Bill 5's amendment to section 621 convincingly refute EDD's contention that Assembly Bill 5 should be given retroactive effect here because the intent of the bill was to "clarify" the application of the *Dynamex* test.[9]  There is a critical difference between legislation that clarifies the meaning of an existing statute (applied retroactively because the clarification simply declares what was always intended) and that which clarifies the application of case law by expanding it to different contexts (applied prospectively).[10]  As we have explained, *Dynamex* adopted the ABC test and applied it to wage order violations and related Labor Code claims.  Assembly Bill 5 codified *Dynamex in those contexts*, but also *expanded* application of the ABC test to the assessment of unemployment insurance taxes.  And it made clear that

[9]     EDD also asserts that statutory exemptions in Assembly Bill 5 for certain businesses (former Labor Code, § 2750.3, subds. (c)–(h)) indicate the Legislature understood *Dynamex* to apply retroactively because "[i]f *Dynamex* is only prospective, there would have been no need to actually scale back the scope of its holding." As we have already explained, it was for the Supreme Court to decide the retroactive effect of *Dynamex*, which it did in *Vazquez*. Moreover, the existence of statutory exemptions in Assembly Bill 5 is irrelevant to deciding whether or to what extent the Legislature understood *Dynamex* to be retroactive.

[10]     Although it cites no authority in support of its argument, EDD presumably refers to the principle that where courts "have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration." (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473.)  In this way, the Legislature might help "clarify" the meaning of existing law where there is uncertainty or controversy in the courts as to what was originally intended.  This principle has no application here because Assembly Bill 5 contains no provisions clarifying what an earlier Legislature meant by the phrase "usual common law rules" in section 621, former subdivision (b).

19

this expanded treatment would be prospective, applicable to work performed on and after January 1, 2020.[11]

Thus, we hold that with respect to unemployment insurance taxes for work performed before January 1, 2020, the "usual common law rules" within the meaning of section 621, former subdivision (b) are the *Borello* factors. For work performed on and after January 1, 2020, the ABC test applies under current section 621(b) as amended by Assembly Bill 5, as well as under current Labor Code sections 2775, subdivision (b)(1) and 2785, subdivisions (a) and (c).

B. *Substantial Evidence Supports the Trial Court's Finding of an Employee Relationship Under the* Borello *Factors.*

1. *The Standard of Review is Substantial Evidence*

Determining whether a person is an employee or an independent contractor is generally a question of fact if it depends on resolving disputes in the evidence, but it can be decided as a matter of law if the evidence supports only one credible conclusion. (*Borello, supra,* 48 Cal.3d at p. 349.) "As a result, appellate case law in this area arises primarily in the context of

---

[11]  The prospective-only application of the ABC test to unemployment insurance is confirmed by Assembly Bill 5's legislative history. A bill summary noted that applying the ABC test to determine unemployment tax "*represents a change* from how [EDD] has conducted employment status determinations previously (which were based on common law)." (Sen. Com. on Appropriations, Rep. of Assem. Bill 5 (2019–2020 Reg. Sess.) July 11, 2019, p. 6, italics added.) Similarly, an Assembly Committee analysis noted that applying the ABC test in the unemployment insurance context would result in "more workers classified as employees" when compared "to EDD's current practice." (Assem. Com. on Appropriations, Analysis of Assem. Bill 5 (2019–2020 Reg. Sess.) May 16, 2019, p. 3.) Legislative history of Assembly Bill 5 can be found at <http://leginfo.legislature.ca.gov/faces/billAnalysis Client.xhtml?bill_id=201920200AB5> [as of Mar. 16, 2021], archived at <http://perma.cc/63KW-XMWH>.

substantial evidence review of the determinations of the relevant fact finder." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 78 [collecting cases].)

VSC does not dispute that if *Borello* applies, the trial court considered the correct factors. Rather, it contends the court misapplied those factors to undisputed evidence. As a result, it asserts that the appropriate standard of review is de novo.

This case involves evidence that must be weighed by a trier of fact. For example, VSC contends that the court made a "fundamental error" in determining that VSC has the right to control the project specialists because VSC does not direct how project specialists conduct source inspection. However, the evidence on VSC's control was not one-sided.

If a Verify customer is dissatisfied with a project specialist, VSC had the right to (and would) investigate the complaint and initiate corrective action. VSC was able to terminate a project specialist for any reason, even apart from a customer's complaint. It could also compel a project specialist to work without pay under certain circumstances. VSC further required project specialists to input results of source inspections on VSC's computer system. A VSC group leader will respond to a project specialist's request for assistance. Project specialists are required to remain in contact with VSC during an assignment. A former Verify vice president testified that customers expected Verify to supervise the project specialists.

There was also conflicting evidence on whether project specialists were engaged in a separately established business. Some had established corporate entities for VSC work. Others had not. And even some who had established a corporation or limited liability company had no clients besides VSC, did no advertising, had no website and no business card.

Accordingly, determining whether project specialists are VSC's employees or independent contractors is a factual issue, and the trial court's finding must be upheld if supported by substantial evidence. (*Borello, supra*, 48 Cal.3d at p. 349.)

### 2. *Although VSC Has Forfeited the Substantial Evidence Issue, There is No Prejudice to EDD and We Will Consider the Point.*

VSC stakes its appeal on a de novo standard of review. The opening brief devotes 26 pages in arguing that "[i]ndependent review of the evidence reveals that the trial court's analysis of the *Empire Star / Borello /* [regulation] 4304-1 factors was deeply flawed." Because the substantial evidence standard applies instead, it is unnecessary to consider this argument.

Alternatively, VSC contends, "Should the [c]ourt conclude the proper standard of review be the substantial evidence test, the [c]ourt should still reverse." This argument is less than one page in VSC's opening brief. It contains no record citations and no legal analysis. VSC simply asserts, as if self-evident, that "there is no substantial evidence to support the trial court's ruling of employee status. The evidence shows that the [p]roject [s]pecialists are independent contractors, providing on demand source inspection services for a variety of military and aerospace contractors."

" 'An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.' " (*Verrazono v. Gehl Company* (2020) 50 Cal.App.5th 636, 652.) Accordingly, a party challenging the judgment for

22

lack of substantial evidence must " 'set forth, discuss, and analyze *all* the evidence on that point, *both favorable and unfavorable.*' " (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.)  "Unless this is done the error is deemed to be waived." (*Ibid*.)  By failing to cite evidence supporting the judgment and explain why such evidence is insufficient, VSC has forfeited the substantial evidence issue.

Nevertheless, we exercise our discretion to consider the point because EDD (1) has not argued forfeiture, and (2) is not prejudiced, having fully briefed the *Borello* factors and cited the evidence it contends supports the findings.  We deem VSC's arguments challenging the *Borello* findings on a de novo standard of review to encompass an alternative claim that each is also unsupported by substantial evidence.

### 3. *The Trial Court's Finding of an Employee Relationship is Supported by Substantial Evidence.*

#### a. *VSC had the right to control and exercised actual control*

Under regulation 4304-1, "the most important factor" in distinguishing an employee from independent contractor is the employer's right "to control the manner and means of accomplishing a desired result."  Substantial evidence supports the court's finding that VSC had the requisite right to control.  VSC determined the manner and means of reporting source inspection results.  It also provided supervision and advice upon a project specialist's request.  A former VSC vice president testified that customers expected supervision.  Moreover, "the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 (*Ayala*).)  Under the Agreement, VSC is authorized to terminate the project specialist without cause.

23

Citing *Varisco v. Gateway Science & Engineering* (2008) 166 Cal.App.4th 1099 (*Varisco*), VSC claims that all it did was "connect the [p]roject specialists with suppliers and primary contractors" and "[t]he fact that VSC . . . required the [p]roject [s]pecialists to report their inspection" in a particular manner is insufficient to establish an employer-employee relationship. It asserts that "[w]hat matters is whether the principal oversees the actual work" and not, as the trial court believed, whether it controls the reporting of the work.

However, the facts in *Varisco, supra*, 166 Cal.App.4th 1099 are significantly distinguishable. In *Varisco*, a company providing quality assurance services, called Gateway, hired an inspector to check construction undertaken by a school district. (*Id.* at p. 1102.) Gateway paid the inspector by the hour and sent him to the job site. That is all Gateway did. (*Id.* at p. 1105.) Gateway did not train the inspector. (*Ibid.*) If questions arose, the inspector addressed them to the school district, not to Gateway. (*Ibid.*) The inspector reported results to the school district on its forms, not Gateway's. (*Id.* at p. 1106.) He supplied his own tools and equipment. (*Id.* at p. 1105.) On these undisputed facts, the court determined that the inspector was an independent contractor. (*Ibid.*)

VSC's project specialists are unlike the *Varisco* inspector in a number of significant respects:

- VSC provided customer orientation to project specialists.

- A Verify program leader instructed project specialists how to use suppliers' reporting systems.

- Using Verify educational materials, VSC mandated that project specialists pass an ethics test based on VSC's code of ethics.

24

- VSC required that project specialists pass a safety test based on educational materials used by both Verify and VSC.

- VSC arranged work-related travel for project specialists.

- VSC provided project specialists with VSC branded business cards.

- VSC trained project specialists on certain international regulations.

- Customers expected Verify to supervise, oversee, and manage project specialists.

- VSC provided software for project specialists to record time and upload the results of the source inspection.

VSC also contends that its right to terminate without cause does not evidence control because the Agreement requires 30 days' notice. However, the notice period is not dispositive. The right to discharge is probative of a right to control because instructions " ' " 'would have to be obeyed' " ' on pain of at-will ' " 'discharge[] for disobedience.' " ' " (*Ayala, supra,* 59 Cal.4th at p. 533.) Project specialists work only when VSC contacts them about a potential project. Even with a 30-day notice period, a right to discharge without cause would reasonably be expected to compel a project specialist desiring future assignments to obey VSC's directives.

In *Espejo, supra,* 13 Cal.App.5th 329, this court considered whether newspaper carriers were employees or independent contractors under a contract that was terminable without cause on 30 days' notice. (*Id.* at p. 346.) The trial court in *Espejo* relied on the termination provision, among other factors, to determine the carriers were employees. (*Ibid.*) Applying the *Borello* test this court affirmed, stating that the right to "terminate the contract on 30 days' notice" evidenced the hirer's right to control under regulation 4304-1. (*Espejo,* at pp. 348, 351.)

25

In a related argument, VSC contends that under the Agreement, project specialists also have a right to terminate without cause. Citing *Beaumont-Jacques v. Farmers Group, Inc.* (2013) 217 Cal.App.4th 1138, *Ayala*, *supra*, 59 Cal.4th 522, and *Perguica v. Industrial Accident Commission* (1947) 29 Cal.2d 857, it maintains that a mutual at-will termination provision indicates an independent contractor relationship. But the problem with this argument lies in its premise. VSC project specialists do *not* have a right to terminate without cause. Although the Agreement provides that "[e]ither party may terminate this Agreement at any time and for any reason, without [c]ause," the same sentence contains an exception. The exception is that a project specialist "may not terminate without [c]ause after [he or she] has accepted a project until [the project specialist] has completed the project or [the project specialist] shall be financially responsible for any additional costs incurred to complete the project." Because VSC hires project specialists on a project-by-project basis, a right to terminate without cause only after the project is complete is effectively no right to terminate at all.[12]

---

[12] Citing *Ayala*, *supra*, 59 Cal.4th at page 531, footnote 2, VSC also contends that a worker who is required to finish a project before terminating a contract of hire "is an independent contractor." However, *Ayala* merely states that such facts are "relevant," not dispositive. It also confirms that the "strongest evidence of the right to control is whether the hirer can discharge the worker without cause." (*Id.* at p. 531.) Consistent with *Ayala*, the trial court considered VSC's right to terminate without cause as an important but not determinative factor in its analysis.

b. *Project Specialists are not engaged in a distinct business*

The trial court found that some project specialists had created their own business entities, but others did not. It concluded that this factor "slightly favors EDD" because "even those who had created their own entities really were not doing much with them outside of their work for VSC." VSC contends "the undisputed evidence" is otherwise.

The record supports the trial court's finding. Patrick L. testified that his business entity has no website, no e-mail address, no business cards, and no employees except himself. Elizabeth M. similarly testified that her business entity has no other employees, no clients besides VSC, no website, does no advertising, and has no business cards. Other project specialists had not created separate entities. John B. testified that has worked only for VSC and has no independent business. Val S. has no separate business entity and has worked almost exclusively for VSC for 20 years.

The trial court could properly evaluate this evidence as providing some support for a finding that project specialists were employees.

c. *There was no evidence on whether the work is usually done in the locale without supervision*

The trial court found that the parties offered "very little evidence" on whether source inspection is "usually" done without supervision. Elaborating on this factor, the court noted:

> "There was no expert testimony addressing whether, in Southern California, source inspection is typically done using the business model used by VSC and its competitors, or rather done by employees of prime contractors. The standard of practice in the industry was *argued*, but not really developed factually by either side." (Italics added.)

27

Determining that "the evidence on this factor really favors neither side," the court concluded that "EDD prevails on this issue" because VSC bore the burden of proof.

VSC contends the court erred because the "only evidence" is that project specialists "were not supervised while conducting inspections." However, the argument misses the target. This factor focuses on how the work "is usually done" in a given locale, not how the work was done in this particular case. Evidence that VSC did not supervise in a hands-on manner during source inspections sheds light on VSC's practices, but without more does not demonstrate how source inspection "is usually done" in the locale by others performing similar tasks.

### d. *Project specialists are highly skilled*

Source inspection requires highly skilled labor. The trial court acknowledged that many project specialists had "years if not decades of experience," and the court found this factor favored VSC.

### e. *Neither VSC nor project specialists supplied the tools and instruments*

The trial court found that measuring instruments used in source inspection are supplied by neither VSC nor the project specialists, but instead by the supplier. The court determined this factor "slightly favored EDD" because a "true independent contractor would invest heavily in his/her own measuring equipment and keep it calibrated." VSC contends the court erred because suppliers are contractually required to provide the measuring instruments, which must be calibrated to precise specifications.

We agree with VSC. In distinguishing employee from independent contractor, ownership of tools is probative because ownership implies a right to control their use. Here, however, neither VSC nor the project specialists

28

own the instruments, nor as a practical matter could they. Accordingly, this factor does not apply here.[13]

### f. *The work is continuous*

The trial court found that many project specialists had ongoing long-term relationships with VSC. Several worked "near full time 40 hour weeks." The court determined this factor "easily favored EDD" and indicated "an employment [rather] than an occasional independent contractor relationship."

VSC contends this finding is erroneous because (1) the Agreement provides, "Continuity of relationship . . . is not contemplated"; (2) project specialists testified they could (and did) decline work without negative repercussions; and (3) some project specialists choose to work only part time. However, there was also evidence that project specialists had worked exclusively for VSC for 11, 18, 20, and even for 28 years. The evidence VSC relies on might support a different finding, but it does not establish a lack of substantial evidence to support the finding made.

### g. *Project specialists are paid by the hour, not by the job*

VSC paid project specialists by the hour, which is the industry standard. There was no contrary evidence. The trial court determined this factor favored an employee relationship because "[a] true independent contractor would be able to develop and charge a flat fee per visit to a supplier site."

VSC contends there was "no evidence" that a true independent contractor would charge a flat fee for source inspection. Citing *National Elevator Services, Inc. v. Department of Industrial Relations* (1982) 136

---

13    We will consider whether this error was prejudicial after analyzing the remaining *Borello* factors. (See *post*, at part B(3)(k).)

Cal.App.3d 131, VSC asserts that historically, hourly wages indicated an employer-employee relationship; however, modernly, "there is no logical connection" between hourly pay and distinctions between employee and independent contractor. (*Id.* at pp. 170–171.) VSC points out that attorneys, quintessential independent contractors, customarily bill by the hour.

VSC's argument is not unreasonable. Receiving hourly wages is not a completely reliable guide to distinguishing between employee and independent contractor. But common experience teaches that a worker who receives hourly wages is likely (but not necessarily) an employee, and a worker who receives payment by the task is likely (but not necessarily) an independent contractor. Accordingly, the court did not err in considering this factor as tilting towards employee status.

h. *Source inspection is a part of VSC's regular business*

VSC asserts the evidence was "undisputed" that its business is maintaining a database of highly skilled self-employed project specialists, and VSC does not do source inspections. The trial court disagreed. It found that "VSC's only client is Verify, and Verify's clients are the aerospace and defense contractors who benefit from the labor provided by project specialists." The court concluded that "the work in question, principally source inspections, is at the *core* of what the Verify group of companies provides to its aerospace customers." By way of comparison, the court noted that a "caterer brought in to serve dinner at Verify's holiday party would be an independent contractor" as would an "asphalt company brought in to re-surface the parking lot at Verify's headquarters" and a "plumber brought in to repair a leak in the executive washroom in Verify's offices."

VSC contends the court erroneously determined that project specialists are "part of VSC's database business." However, this misstates the court's

30

finding. The court "reject[ed] [VSC's] strained effort to portray itself as just a database manager." Rather, the court found that VSC "is part of a unitary business providing staffing solutions to its aerospace clients." To the extent VSC's argument encompasses a challenge to that determination, we reject it. Although the trial court did not have the benefit of *Uber*, *supra*, 56 Cal.App.5th 266, the analysis in that case supports the court's conclusions here.

Uber offers a mobile phone application that matches those in need of a ride to drivers available to give them rides using their own vehicles. (*Uber*, *supra*, 56 Cal.App.5th at p. 278.) VSC is similar—it offers a database to match those in need of a source inspection with a project specialist available to do so. The contracts between Uber and its drivers provide that the relationship is not one of employment, but instead as "independent business enterprises, each of whom operates a separate and distinct business enterprise that provides a service outside the usual course of business of the other." (*Id.* at pp. 278–279.) Similarly here, the Agreement characterizes the relationship as that of independent contractor. Uber drivers need not accept any minimum number of rides to use the platform, are free to work for competitors (such as Lyft) and to decline work. (*Id.* at p. 279.) Uber monitors its drivers and may use low ratings to "deactivate" them. (*Id.* at p. 280.) Similarly, project specialists are free to decline offered work, and VSC monitors its project specialists' performance and in response to customer complaints, can terminate a project specialist and remove the person from the database.

Uber asserted that it was not in the business of providing rides, but instead merely provides a platform to connect drivers and riders. (*Uber*, *supra*, 56 Cal.App.5th at pp. 280–281.) VSC's claim—that it is not in the

31

business of providing project specialists, but instead merely a database to connect project specialists with customers—is strikingly similar.

The court in *Uber* recognized that Uber's business model was "different from that traditionally associated with employment, particularly with regard to drivers' freedom to work as many or as few hours as they wish, when and where they choose." (56 Cal.App.5th at p. 294.) It nonetheless concluded that the drivers performed services in the regular course of Uber's business. The court reasoned that "the parties' characterization of their relationship is not dispositive because their 'actions determine the relationship, not the labels they use.'" (*Id*. at p. 295.)

Similarly here, all of VSC's revenue comes from providing project specialists from its database to Verify. Like Uber, VSC screens potential candidates, collects information on their job performance, and may use negative customer reports to discipline and even terminate a project specialist. Also like Uber, VSC's business differs from traditional employment, particularly with regard to the project specialist's freedom to decline work and work as many or few hours as he or she chooses. Such facts did not compel a finding of independent contractor status in *Uber* and similarly fail to do so here.

### i. *The parties believed they were creating an independent contractor relationship*

The Agreement specifies the relationship between VSC and a project specialist is that of independent contractor. Project specialists all testified they believed they were independent contractors and many enjoyed the flexible working hours that relationship afforded. Apart from noting this evidence, VSC makes no argument about its significance.

The trial court found this factor "easily favored" VSC. Obviously, VSC does not challenge that finding. As even the Supreme Court in *Borello*

recognized, however, "[t]he label placed by the parties on their relationship is not dispositive." (*Borello*, *supra*, 48 Cal.3d at p. 349.) Courts ignore the parties' characterization if their actual conduct establishes a different relationship. (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10–11.)

> j. *VSC operates as a business, not an individual*

VSC acknowledges that it operates as a business and this factor "leans" towards establishing an employer-employee relationship.

> k. *The* Borello *weighing and harmless error*

"[T]he process of distinguishing employees from independent contractors is fact specific and qualitative rather than quantitative." (*State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 202.) " ' "[T]he significance of any one factor and its role in the overall calculus may vary from case to case depending on the nature of the work and the evidence." ' "[14] (*Uber*, *supra*, 56 Cal.App.5th at p. 276.)

Here, the trial court determined that the two factors favoring an independent contractor relationship—the skilled nature of the work, and the parties' belief they were creating an independent contractor relationship— "should be accorded less weight in light of the evidence of right to control and

[14] VSC requests judicial notice of four Unemployment Insurance Appeals Board decisions finding certain VSC project specialists to be independent contractors. EDD opposes this request, noting that the court sustained objections to these documents and contending, in any event, that the decisions are not relevant. The Unemployment Insurance Appeals Board designates certain of its decisions as "precedent decisions." (§ 409.) Decisions by the Unemployment Insurance Appeals Board that have no precedential effect are not subject to judicial notice. (*Employment Development Department v. California Unemployment Ins. Appeals Bd.* (2010) 190 Cal.App.4th 178, 188, fn. 4.) VSC concedes that the decisions attached to its request for judicial notice are not precedential decisions. Therefore, the request for judicial notice of exhibits 1 through 4 is denied.

in light of the fact that the project specialists are absolutely critical to VSC's success." Accordingly, it found that VSC failed to carry its burden to establish that the employee classification was erroneous. As we have indicated in discussing the individual *Borello* factors, the court's qualitative weighing of those factors was appropriately within the boundaries of its discretion.

We have recognized that the trial court made one error in considering the tools-and-instruments factor as indicating an employee relationship. However, this error is prejudicial only if it is reasonably probable that a result more favorable to VSC would have been reached absent the error. (See *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 348.)

We comfortably conclude this single error is not prejudicial for three reasons. First, the court found this factor weighed only "slightly" in EDD's favor. Second, although this factor does not favor EDD, it also does not favor VSC. Thus, even if the court had correctly determined that this factor was inapplicable, there would still be only two *Borello* factors favoring an independent contractor relationship. Third, the court stated the *most significant factor* was that the project specialists are " 'active instruments' " of VSC's enterprise and provide an " 'indispensable' " service to VSC. As discussed above, the evidence fully supports that finding.

C. *The Trial Court Did Not Make, Nor Was It Required to Make, the Additional Findings That VSC Purports to Challenge.*

The only issue litigated at trial was whether project specialists were VSC's employees or independent contractors. VSC's trial brief asserts, "The single issue to be tried here is whether Project Specialists in California between 2011 and 2013 are independent contractors or employees, and if so, [*sic*] is entitled to a full refund of tax and interest paid." EDD's attorney

34

agreed, asserting in opening statement, "The issue in this case, as counsel indicated, is whether EDD and the Unemployment Insurance Appeals Board were mistaken in determining that the workers at issue here . . . are, in fact, employees." Notwithstanding this apparent agreement, VSC contends that trial court erred in failing to make findings on whether VSC and Verify were "unitary businesses" for purposes of section 135.2 and whether VSC was a "leasing" or "loaning" employer pursuant to section 606.5.

Neither of these issues was presented to the court for decision. The first mention of section 135.2 at trial was after VSC rested and EDD brought a motion for judgment under Code of Civil Procedure section 631.8. In asserting that project specialists are "integral to the work of VSC," EDD's lawyer noted "[p]reliminarily" that "VSC and Verify are a unitary business. They have largely the same officers, they have the same objective. They work hand in glove. Verify gets the clients. VSC supplies the project specialists. And the concept of what's called a unified business enterprise or unitary business is made applicable . . . [by] . . . section 135.2 and it certainly applies here." Later during closing argument, EDD's attorney made the same observation, mentioning section 135.2 once. Without citing the statute, the court's statement of decision contrasted VSC's contention that its business "is simply to maintain and manage [a database]" with EDD's position that VSC and Verify "are a unitary business providing a range of staffing solutions." It added, "The evidence easily preponderates in favor of EDD's view."

This does not amount to a finding for purposes of section 135.2 that VSC and Verify constituted "one employing unit." Indeed, the statement of decision nowhere mentions the statutory term, "one employing unit." Although the court described Verify, VSC, and VTR as a "unitary business," that was only for purposes of determining whether source inspection is part

of VSC's regular business under *Borello*—a distinctly different issue from whether the requisite control has been exercised to sustain a finding of "one employing unit" under section 135.2.[15] The fact that VSC objected to the court's proposed statement of decision by requesting that the court rule on this issue[16] does not change the fact that the statutory issue was not before the court, nor can it compel the court to make specific findings pursuant to section 135.2 that were not otherwise required.

For similar reasons, the court was not required to make statutory findings as to whether VSC was a "leasing" or "lending" employer within the meaning of section 606.5. Again, this was not an issue presented to the court for resolution. VSC references the fact that section 606.5 was mentioned several times in the court's statement of decision. But the court did not cite or otherwise rely on section 606.5 in addressing the issue it *was* required to decide—application of the *Borello* factors to determine that an employer-employee relationship exists between VSC and project specialists for work performed during the audit years. Accordingly, it is unnecessary to consider this point and we express no opinion on it.

---

15    To the extent VSC is challenging the factual basis for the court's reasoning, there is more than substantial evidence. Several individuals have dual roles in both VSC and Verify. For example, Bernard Fallon, who founded VSC, is a VSC officer and on Verify's board of directors. James McIntosh serves as president of both Verify and VSC. Andrew Wright is VSC's chief financial officer (CFO). He is also CFO for Verify and VTR. All of VSC's revenue is from supplying project specialists to Verify. Wright testified that Verify and VSC have an "arm's length" agreement for those VSC services. Wright negotiated that agreement as a member of both Verify and VSC. The same people were on both sides of this "arm's length" negotiation.

16    The trial court overruled the objection, explaining that "a court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case."

DISPOSITION

The judgment is affirmed.  Respondents are entitled to costs on appeal.


DATO, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.